# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DENNIS JEFFERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:17-cv-00697** |
| **v.** | ) | **Judge Campbell** |
| | ) | **Magistrate Judge Brown** |
| | ) | |
| **FRESENIUS MEDICAL CARE** | ) | |
| **HOLDINGS, INC. A/K/A FRESENIUS** | ) | |
| **MEDICAL CARE NORTH AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

To: The Honorable Chip Campbell, United States District Judge

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's motions for summary judgment (Docket Entry Nos. 96, 98 and 100). The Magistrate Judge **RECOMMENDS** that these motions be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE.**

## I. INTRODUCTION

Plaintiffs, Dennis Jefferson, Timothy Waire and Rosemary Webster,[1] filed this *pro se* action against Defendant, Fresenius Medical Care Holdings, Inc., asserting claims for employment discrimination in violation of 42 U.S.C. § 2000e *et seq*., ("Title VII), and 42 U.S.C. § 1981. All three Plaintiffs assert that they were denied a promotion on the basis of race (African American) and were subjected to racial harassment. Plaintiffs Waire and Webster also assert a claim for retaliation. The District Judge referred the case to the Magistrate Judge for decision on all pretrial,

---

[1]Plaintiffs, Connie Hannah and Latoya Cosby, were dismissed from this action. (Docket Entry Nos. 54, 71 and 72).

nondispositive motions, and a report and recommendation on any dispositive motions. (Docket Entry No. 25).

## II.  FACTUAL BACKGROUND[2]

Defendant, Fresenius Medical Care Holdings, Inc.,[3] is a provider of products and services for individuals undergoing dialysis treatment because of chronic kidney failure. (Docket Entry No. 53, Third Amended Complaint, at ¶¶ 7-8).  In the fall of 2015, Defendant determined it needed an additional team lead role on its User Security team to help account for anticipated changes in the User Security team manager's responsibilities.  (Docket Entry No. 122, Plaintiffs' Response to Defendant's Statement of Undisputed Facts, at ¶ 1).[4]  At that time, Sander Schambeck served as the User Security team manager and Anthony Whitehead served as the existing team lead.  *Id*. at ¶ 2. The team lead position would be responsible for providing Tier II technical support to customers

_____

[2]Defendant filed contemporaneously with its motions for summary judgment a statement of undisputed facts (Docket Entry No. 102), in accordance with Local Rule 56.01(b).  Where Plaintiffs did not respond to Defendant's statement of undisputed facts, Defendant's proffered statements of fact are undisputed for purposes of summary judgment.  Local Rule 56.01(f).  Where Plaintiffs responded to certain statements of facts as disputed, but failed to cite to specific citations in the record to support their responses or cited to records that do not support Plaintiffs' responses, such statements of undisputed material facts are deemed undisputed for failure to comply with Fed. R. Civ. P. 56(c)(1) and Local Rule 56.01(c)(3).  Similarly, as to Plaintiffs' statement of additional undisputed material facts (Docket Entry No. 123), many of the statements are not supported by specific citations to the record and are in noncompliance with Fed. R. Civ. P. 56(c)(1) and Local Rule 56.01(b).

[3]In its motions for summary judgment, Defendant asserts that it does not waive its argument that Plaintiffs have sued the wrong entity and Defendant is not the proper party to this action. (Docket Entry No. 97, at 1 n.1; Docket Entry No. 99, at 3 n.2; Docket Entry No. 101, at 2 n.2); *see* Docket Entry No. 52, at 1.

[4]Not all of Plaintiff's responses correspond numerically to Defendant's numbered paragraphs in its statement of undisputed facts.  (Docket Entry No. 122).  The Magistrate Judge cites to the correctly numbered paragraphs in Defendant's statement of undisputed facts.  (Docket Entry No. 102).

2

and assisting Tier I agents on the team with technical issues relating to user security. *Id.* at ¶ 3. On September 17, 2015, the team lead role was posted internally on Defendant's intranet, "FMC4ME," and externally on the internet for about 24 hours. *Id.* at ¶ 4; Docket Entry No. 105-1, at 1. The posting stated, in part:

> PURPOSE AND SCOPE:
> . . . .
>
> Under the direction of the Help Desk Manager provides support to FMCNA staff regarding computer applications and hardware. As a senior member, leads and directs the help desk group to effectively troubleshoot computer problems and issues, determine the source, and advise on the appropriate action for resolution while adhering to pertinent policies, procedures, regulations and standards. Participates in projects as needed, either individually or as part of a team.
>
> . . . .
>
> PRINCIPAL RESPONSIBILITIES AND DUTIES:
>
> Works with members of the Help Desk Senior Staff Team to oversee daily operation of Help Desk. Including:
>
> - Maintains schedule for Help Desk Staff to ensure appropriate coverage.
> - Identifies system wide issues and escalates if necessary and follows up on issues to be sure all parties (support teams and customers) are informed and kept up to date.
> - Monitors daily phone reports to be sure that staff is logged into appropriate skills as scheduled.
> - Provides computer related technical phone support and guidance for all of FMCNA employees.
> - Responds to customer calls and questions, identifies, researches, and troubleshoots the issue, determines appropriate action and carries out solution or escalates to management.
> - Utilizes knowledge of computer software/hardware, resolves intermediate to highly difficult problems; e.g. Unix, PC software/hardware, communications, SAP, Lotus Notes, MS Office, Proton, Medical Manager, Kronos, printing issues, etc.
> - Acts as escalation contact for customer issues.
> - Monitors the centralized tracking system and resolves issues. Monitors emails sent to Help Desk Senior Staff Team.
> - Researches and analyzes management reports. Determines strategies to streamline the process and reduce calls.
> - Make recommendations to management.

3

- Researches and evaluates technical information and online departmental procedures for problem resolution.
- Recommends procedure changes and updates procedure manuals as required.
- Tracks Help Desk calls from start to completion and provides 24 X 7 on-call escalation support.
- Posts system wide issues to the Portal and MSO (Major System Outages) messages as needed.
- Participates in and/or leads additional projects both as an individual or as part of a team as directed by manager.
- Other duties as assigned.

(Docket Entry No. 105-1, at 3-4, 5). The job posting for the team lead position also stated that a "Bachelor's Degree in Computer Science or equivalent experience" was required. (Docket Entry No. 122, at ¶ 5).

While the team lead position was posted, several external applicants applied. *Id*. at ¶ 6. The job posting was closed because Dwight Lay, a current User Security team member, was identified for the position. *Id*. at ¶ 7. Defendant's "Employee Transfer & Internal Job Posting" policy provides, in part:

All regular vacant positions are posted on FMC4ME in accordance with FMCNA'|s Equal Employment Opportunity policy.

Vacant positions are posted internally for a minimum of 5 business days prior to making any offer of employment.

Job transactions/vacancies may not be posted as a result of:

•Re-title, reclassification, or re-grade of positions occupied by incumbents, and
•Transfer or reorganization of responsibilities within or between departments.
•Positions through succession planning

(Docket Entry No. 105-2, at 1).

Director of Production Support Services at the time, Joseph Dixon (African American), consulted with Schambeck to determine which individuals on the User Security team would be the best fit for the team lead role and decided that Lay was the best choice based on his years of service,

4

job performance, skill set, and demonstrated leadership. (Docket Entry No. 122, at ¶¶ 9-10, 18). Lay worked as a contractor for Defendant beginning in 2008, and after applying for the position of User Security administrator, Defendant hired Lay as an employee on the User Security team in October 2011. *Id*. at ¶ 11; Docket Entry No. 126-1, at 3. Lay had received high ratings on his most recent performance review with an overall "1+" rating and "proficient" status. *Id*. at ¶ 12.[5] Proficient is described as: "on a leadership, technical and project completion basis, employee has demonstrated performance that consistently exceeds expectations for the given year." *Id*. at ¶ 24. The cited reasons for choosing Lay were his tenure on the User Security team, his positive performance, unsolicited positive feedback the management team had received from clients about Lay, and his managers' observations that peers were already treating Lay as a team lead by reaching out to him for Tier II technical guidance, and that without being asked, Lay had recently taken on some aspects of a team lead role when assistance was needed. (Docket Entry No. 105, Debra Ponte Declaration, at ¶ 4). Lay did not complete an application for the team lead position. (Docket Entry No. 126, at 6, ¶ 4). In an email dated September 17, 2015, Deb Ponte, the Senior IT Talent Acquisition Partner, advised Lay the following: "I found your resume and application already in the system so have transferred your file over to the Lead Help Desk position, you won't need to apply and complete the application process again. . . . .fyi." (Docket Entry No. 115).

Lay was selected and reclassified to the team lead role, and Dixon announced the move (along with other organizational changes) via email on October 2, 2015. (Docket Entry No. 122,

---

[5] The performance ratings are based on a 1-5 scale, with "1" (the highest possible score) being outstanding, "2" proficient, "3" developing, "4" needs improvement, and "5" unsatisfactory. *Id*. at ¶ 23.

5

at ¶¶ 18-19). Lay's reclassification to team lead did not result in additional personnel to the User Security team. *Id*. at ¶ 20. Lay's title changed to team lead. *Id*. at ¶ 21.

### A. PLAINTIFF JEFFERSON

Plaintiff Jefferson is a high school graduate. *Id*. at ¶ 25. Jefferson attended Lincoln University around 1991 or 1992 and studied criminal justice, but did not obtain a degree. *Id*. at ¶ 30. Later in life, Jefferson took an online/evening technical training program called "Tech Skills" where, between June and December 2005, he obtained a number of IT certifications, including CompTIA's entry-level A+ certification, CompTIA's Network+ certification and certifications relating to the 2003 Microsoft Office suite. *Id*. at ¶ 37. Jefferson has not obtained any certifications in any more recent Microsoft Office suites and has not participated in CompTIA's continuing education program. *Id*. at ¶ 38. From 2006 to approximately January 2011, Jefferson worked at several companies where he basically did "the same thing," which included assisting with "break/fix, software installation, upgrade." *Id*. at ¶¶ 39-43.

On or about January 17, 2011, Jefferson was an employee of Beacon Hill Technologies, a temporary staffing agency, when he began working at Defendant's Nashville, Tennessee office on a temporary assignment. *Id*. at ¶¶ 44-45. On April 29, 2013, Defendant hired Jefferson as an employee in the position of a User Security Administrator on the User Security team. *Id*. at ¶ 46. Jefferson received Defendant's employee handbook. *Id*. at ¶ 47. On his first annual performance review as an employee, Jefferson received a "3" rating and overall "developing" status, and on his 2014 review, he received a "2+" rating and maintained an overall "developing" status. *Id*. at ¶¶ 48-49. "Developing" is defined as: "On a leadership, technical and project completion basis, employee

6

performs job tasks so as to generally meet expectations with some input from management and demonstrates capacity for further development in current job." *Id*. at ¶ 50.

In a March 4, 2016 email to Jefferson, Gina Elyazar, Defendant's Human Resources Manager, explained that "the Team Lead position was posted on September 17, 2015 and was taken down on September 18, 2015 at Joseph Dixon's request," and that "[a]lthough the posting policy was not followed in this case, which we are addressing, Joseph made the decision to give Dwight Lay the job based on legitimate business reasons." (Docket Entry No. 124-1). Jefferson admits that no one ever told him that the reason he did not receive the promotion as to team lead on the User Security team was because he lacked education. (Docket Entry No. 122, at ¶ 51). In 2016, Jefferson was offered a team lead position over the call handlers, but turned it down. *Id*. at ¶ 52.

## B. PLAINTIFF WAIRE

Plaintiff Waire is a high school graduate, and following high school, from 2009 to 2011, he attended the Tennessee Technology Center of Murfreesboro, a two year technical school in Murfreesboro, Tennessee, where he obtained several IT certifications, including CompTIA's entry-level A+ certification, CompTIA's Network+ certification and a Microsoft Certified Professional certificate. *Id*. at ¶¶ 53-55. In or about March 2011, Waire obtained his first IT-related job when he began working as a help desk analyst for a dialysis company called Renal Advantage, Inc. ("RAI") where he answered after-hours calls, set up technicians to go to various clinics to fix issues, and configured routers "and digis." *Id*. at ¶¶ 57-58. Waire began working for Defendant when Defendant acquired RAI in or around October 2012. *Id*. at ¶ 59. Waire worked as a help desk analyst on the Applications team from October 2012 until July 31, 2017. *Id*. at ¶ 60. Waire never worked on the User Security team. *Id*. at ¶ 61. Waire described his role on the Applications team

as being "a glorified ticket handler" who "could not even reset a password at that point." *Id.* at ¶ 62. As an Applications team member, Waire was allowed only to work on tickets that were within his scope, and everything else he had to escalate to others. *Id.* at ¶ 63. On his 2015 review, Waire received a "3" rating in every category except one. *Id.* at ¶ 65.

Defendant's anti-discrimination, anti-harassment, and anti-retaliation policies are included in its employee handbook and on its intranet, FMC4ME. *Id.* at ¶ 67. Defendant's employee handbook sets forth several mechanisms for workers to make complaints of perceived unfair treatment, including harassment, discrimination and retaliation. *Id.* at ¶¶ 68-69. Defendant's policies instruct that any form of harassment, discrimination or retaliation should be immediately reported to anyone in management or Human Resources, the immediate supervisor, the next level of supervision, the toll-free Employee Service Center line, or a Vice President of Human Resources. *Id.* at ¶ 70. Waire was provided with electronic access to FMC4ME, where he could access Defendant's anti-harassment and anti-discrimination policies and reporting procedures. *Id.* at ¶ 71.

On March 1, 2016, Waire emailed Elyazar to inform her, for the first time during his employment with Defendant, that he felt discriminated against with regard to Lay's promotion to team lead and to promotion opportunities. *Id.* at ¶ 72. On March 8, 2018, Elyazar spoke with Waire about his complaints, and during their conversation, Waire raised additional concerns about comments made by Gina Foster and Tony Whitehead. *Id.* at ¶ 73. When Waire joined Defendant, Waire worked with Foster, who was a coworker on the Applications team, and with Whitehead, who was a non-management member on the User Security team. *Id.* at ¶ 74. At some point, Foster and Whitehead were promoted to team leads on their respective teams. *Id.* at ¶ 75.

8

Waire did not apply for the team lead role on the User Security team and testified in his deposition that he did not know who made the decision to select Lay for the team lead position or the reasons why. *Id*. at ¶¶ 76-77. Whitehead testified that he was not involved in making the decision to select Lay for the team lead position. *Id*. at ¶ 78. Waire testified that he was not promoted to User Security team lead, in part, because Whitehead had a "personal dislike" for him, and did not like "how I talk, how I walk, my manners, me, my persona in whole," Waire's sexual orientation, the fact Waire "did not grow up struggling" and was financially "okay," or that Waire "came to work happy every day" and "that people liked [Waire]." *Id*. at ¶ 79. When asked, "So . . . you're not saying that you should have gotten the position instead of Dwight Lay?", Waire responded, "I'm saying management dropped the ball. Management should have followed proper policies, posted a position, allowed others to apply, whoever they wanted -- whoever wanted to apply. Everyone should have had interviews. It should have been a legit posting." (Docket Entry No. 103-5, at 54-55).

Waire also testified that during his employment with Defendant, he had been harassed and ridiculed and was made fun of for his sexual orientation, skin tone, hair, and age. (Docket Entry No. 122, at ¶ 80). Waire stated that he tried to avoid Whitehead as much as possible because of the looks that Whitehead would give him. *Id*. at ¶ 82. Waire described his interactions with Whitehead as follows: "I mean, I was sitting at my desk one day, and [Whitehead] comes up behind me and he just pushes his whole body into me, forcing me into the desk. And I'm on the phone with a client. How professional is that? …That is just flat-out harassment. While calling me 'cocksucker' and talking about my hair and my work performances. He's always tried to belittle me." *Id*. at ¶ 83. Waire further stated, "Tony would still harass me…it was several times I - - like gotten up to go to the

restroom, and he was like walking behind me like he was going to like push me into a wall or something like that." *Id*. at ¶ 84.

As to examples of harassment from Foster, Waire testified as follows: "Gina walked up to me while I was working and pulled the earphone out of my head…she is just bullying me at this point;" "I'm on the phone, and - - you know, you can't see what's going on behind you while you when you're working. And Gina Foster - - she's - - I talk with my hands. So she would be back there, you know, portraying like she's me, making fun of me, things of that nature;" and "Gina would walk through and cut her eyes at me." *Id*. at ¶ 85. Waire also stated that Foster made the following comments: "Your hair reminds me of road kill"; "You switched your hair; it makes my skin crawl"; and "I dated a black man once." *Id*. at ¶ 86. Waire testified that he could not remember when Foster made those comments, but believed they occurred sometime between 2013 and 2016. *Id*. at ¶ 87. Waire also testified that Foster and Whitehead sent a coworker, Matt Patrone, over to bother him, stating that "[i]nstead of them putting [Patrone] where he was hired for, to be, they put him on applications with us. And he made everyone uncomfortable." *Id*. at ¶ 88. Waire testified that Patrone engaged in "crazy outlandish conversation" and "he would drool, like all over your desk, or - - and he would get snot all over the place." *Id*. at ¶ 89. Waire testified that in late 2016, he started working remotely due to his issues with Patrone, who was, as Waire described, "the straw that broke the camel's back." *Id*. at ¶ 90. Despite his alleged work environment, Waire testified that he was "a great employee," was "very proficient," and "had the best stats" up until the time he was laid off in July 2017. *Id*. at ¶ 91.

Based on the complaints Elyazar received from Waire and others, Elyazar conducted an investigation and interviewed "everyone in the office." *Id*. at ¶ 92. Upon conclusion of the internal

investigation, Foster and Whitehead each received written warnings, and both were demoted from their team lead positions in April 2016. *Id.* at ¶ 93. On or about April 11, 2016, Defendant informed Waire and others via email that Foster and Whitehead were being demoted from their respective team lead positions. *Id.* at ¶ 94. Defendant also held a training session at the Nashville office to review Defendant's anti-discrimination policies, its expectations of showing respect in the workplace, and how to view and apply for job openings. *Id.* at ¶ 95. During his deposition, Waire could not point to any further specific racial comments or incidents that occurred after Defendant investigated his complaints and demoted Foster and Whitehead. *Id.* at ¶ 96. Waire filed his EEOC charge alleging race discrimination on April 15, 2016. (Docket Entry No. 103-6, at 15).

In or about October 2016, the entire Generalist department in Nashville was outsourced and its team members were laid off as a result. (Docket Entry No. 122, at ¶ 99). In late summer of 2017, Waire and at least two other Application team members working in the Nashville office were laid off when their jobs were required to be centrally located with the manager of the department in Waltham, Massachusetts. *Id.* at ¶ 100. Another IT department, the eCube Support team, was also dissolved as part of the restructuring. *Id.* at ¶ 101. Waire's last day of employment with Defendant was on July 31, 2017. *Id.* at ¶ 102.

## C. PLAINTIFF WEBSTER

After graduating from high school, Plaintiff Webster attended one semester at a community college where she took a psychology and accounting class. *Id.* at ¶¶ 103-04. Webster's prior employment history included work as a personal CPAP consultant for a home healthcare company, customer service representative, collections representative, customer relations specialist, and non-supervisory team lead for an insurance services company. *Id.* at ¶ 106. In late April 2011,

Webster was involved in communications with a representative of the temporary staffing agency, Beacon Hill, about her interest in a temporary work assignment as a Customer Support Call Handler for Defendant, a client of Beacon Hill. *Id*. at ¶ 107. Webster understood that the work was temporary and that an IT background was not needed or even preferred because the call handler would be answering the telephone and putting callers into the right queue for other help desk or desktop support personnel to resolve the callers' questions. *Id*. at ¶ 108. Beacon Hill hired Webster and in May 2011 assigned her to work temporarily on the Generalist team at Defendant's Nashville office. *Id*. at ¶¶ 109-110. Beacon Hill issued Webster's paychecks, addressed her questions regarding her hours worked and holiday pay, provided her benefits (which included workers' compensation), and responded to her requests for pay raises. *Id*. at ¶ 111; Docket Entry No. 103-8, at 9-13. Webster discussed assignment opportunities with Bill Cook, a Beacon Hill representative, who also addressed any complaints from Webster. *Id*. at ¶ 112.

When Webster started working as a call handler for Defendant, she had "very little" IT experience in that she could do a basic password reset, install a printer, obtain an IP address, and flip a screen if it was turned the wrong way. *Id.* at ¶ 113. Webster had no prior work experience assisting users of computer systems with their technology issues and had only limited technical support capabilities (i.e., she could assist with printer installs, verify an IP address, and set up voicemails). *Id*. at ¶ 114. Webster was unable to resolve intermediate to highly difficult IT problems. *Id*. at ¶ 115. During the first three to four months of her assignment with Defendant, Webster's department assisted with some overflow calls from the User Security team. *Id*. at ¶ 116. As part of her job duties as a call handler, Webster was also asked to conduct basic training and job shadowing for those new to the Generalist team. *Id*. at ¶ 117. Webster remained on the Generalist

team throughout her assignment with Defendant and never worked on the User Security team, nor was she ever asked to provide second tier support for the User Security Administrators on that team. *Id*. at ¶ 118.

Webster testified that her assignment ended in or about October 2016 because the job function of the entire Generalist department in Nashville was outsourced. *Id*. at ¶ 119. However, prior to her job ending, Angie Rogers, a program manager with Defendant's Kidney Disease Department, offered Webster a position as her administrative assistant. *Id*. at ¶ 125. Webster pursued employment with Bay State Search, a temporary staffing agency that handled assignments for Rogers's department, and accepted the assignment to be Rogers's administrative assistant while Webster was still working as a call handler. *Id*. at ¶¶ 126-27. Webster earned more in wages per hour as an administrative assistant than she did as a call handler. *Id*. at ¶ 130.

During her assignment with Defendant, Webster worked with Foster and Whitehead when they were team leads for a period of time. *Id*. at ¶ 133. Webster described alleged harassment from Foster as follows: "[A]n incident . . . occurred in the media with [Rachel] Dolezal, the Caucasian woman who posed as an African American and was the NAACP president. [Foster] called me that name, Rachel Dolezal, because of the way my hair looked when it was washed." *Id*. at ¶ 134. Webster testified that she felt pressured into being Foster's secretary and that Foster generally picked on her and generally treated Webster like she was "less than, incompetent." *Id*. at ¶ 135.

As to alleged harassment from Whitehead, Webster stated that in or about 2015, Whitehead commented about Webster's body type, particularly her backside, and told her that he had two new pair of jeans that he did not want to throw out and thought that they would fit her. *Id*. at ¶ 136. When asked why she felt Whitehead's comment about jeans was based on her race, Webster

13

testified, "I felt Tony looked at me in a certain type of way of a relationship-type status. That's why I believe that." *Id*. at ¶ 137. Webster further elaborated, stating, "He called me drunk one night, speaking about money, and he also said my butt looked good in the jeans that he bought -- gave to me. He brought them to work and gave them to me, and I wore them. And when I first started working, he was in competition with one of the workers there that I worked with, and felt that I shouldn't deal with a certain person at the job." *Id*. at ¶ 138.

Sometime in late 2015 or 2016, Webster verbally complained to her manager, John Webb, about feeling picked on by Foster and Foster's comment to Webster about Rachel Dolezal. *Id*. at ¶ 139. Webb told Webster that he would talk with Foster and that if Webster continued to have any problems or if she needed anything more to discuss, for her to come to Webb. (Docket Entry No. 102, at ¶ 140). Webb also explained to Webster that as a team lead, Foster was "there for informational purposes to help him out with the team," but that Foster "does not have the authority to -- as far as telling [her] that [her] job would end . . . if [she didn't] come in." *Id*. at ¶ 141.

In February 2016, Webster contacted Elyazar to complain about Lay's reclassification, discrimination with regard to inconsistent information about education and certification requirements, her inability to see or apply for job postings, Foster and Whitehead's comments to her, and rumors she had heard about a member of management sleeping with someone they managed. *Id*. at ¶ 142. Elyazar conducted an investigation and spoke with other members of Webster's team. *Id*. at ¶ 143. Defendant also held a training session at the Nashville office during March 2016 to address respect in the workplace and how to view and apply for job openings. *Id*. at ¶ 144. Defendant issued written warnings to Foster and Whitehead and demoted them from their lead positions. Id. at ¶ 145. Defendant informed Webster and others in an April 11, 2016, email that

Foster and Whitehead were being demoted from their respective team lead positions. *Id*. at ¶ 146. After Foster and Whitehead were demoted, Webster could not recall any other racially harassing comments from either, and Foster's demeaning behavior towards Webster also stopped. *Id*. at ¶ 147. Webster filed her EEOC charge alleging race discrimination on April 18, 2016. (Docket Entry No. 103-8, at 17).

As to the User Security team lead position, Webster testified that she did not apply for the position. (Docket Entry No. 102, at ¶ 150). Webster admits that no one told her that she did not get the team lead position on the user security team because she did not meet an educational requirement or a certification requirement. (Docket Entry No. 122, at ¶ 151).

Sometime in 2016, Webster also complained to Webb about why two coworkers were allowed to move to different departments and how an investigation into a complaint against Webster compared to an investigation involving a coworker. (Docket Entry No. 102, at ¶ 148). In response, Webb contacted Defendant's Human Resources department who reached out to Webster to discuss her concerns, but Webster admittedly "declined" to talk with Human Resources. *Id*. at ¶ 149.

Webster testified that she never received any formal discipline during her assignment with Defendant. (Docket Entry No. 122, at ¶ 152). Webster testified that she received raises from Beacon Hill based on her experience, her performance, and "meeting the stats, as well as continually training." *Id*. at ¶ 153. As to her complaint about being critiqued, Webster testified as follows:

Q: So in what way has your job performance been critiqued with greater scrutiny than anyone else?

A: I would say making – attempting to continue to make me train when I stated I did not want to. Making it appear that if I said no, then my contract could end. Providing this information to the director of how I felt, and felt that that was a management position, and it shouldn't be handed down to me. Critiquing me in that sense of performing the job.

15

*Id*. at ¶ 154.

### III.  STANDARD OF REVIEW

To prevail on a motion for summary judgment, the movant must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A factual dispute is material if it "might affect the outcome of the suit."  *Anderson*, 477 U.S. at 248.  The nonmoving party cannot simply "rest on its pleadings but must present some 'specific facts showing that there is a genuine issue for trial.'"  *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  To defeat a motion for summary judgment, "the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Anderson*, 477 U.S. at 251). "However, a mere 'scintilla' of evidence in support of the non-moving party's position is insufficient."  *Id*. (citing *Anderson*, 477 U.S. at 251).  "'The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case.'"  *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 837 (6th Cir. 2013) (quoting *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex*, 477 U.S. at 322)).  Finally, "'[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'"  *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  However, the fact that

a plaintiff proceeds *pro se* does not affect the standard by which courts review a defendant's motion for summary judgment, as a *pro se* plaintiff is not entitled to any special treatment from the federal courts. *Bello v. Shaw*, 182 F.3d 916 (6th Cir. 1999) (citing *Brock v. Hendershott*, 840 F.2d 339, 342-43 (6th Cir.1988)).

## IV. ANALYSIS

## A. ADDITIONAL DISCOVERY

As an initial matter, Plaintiffs assert that Defendant has not provided all of "the uncontested documents . . . for Mr. Dwight Lay and due to essential employment files missing for Mr. Lay, the Plaintiffs cannot properly answer and or respond to the Defendant's Motion for Summary Judgement and their Statement of Undisputed Material Facts," and reference that Defendant has not complied with an unidentified Order relating to discovery. (Docket Entry No. 118, at 1, 2; Docket Entry Nos. 119-121, Declarations of Plaintiffs). Plaintiffs assert that Defendant did not send Lay's complete employment file, as the file is missing Lay's 2011 employment application and background check; "Lay's management approval that show who and how the Defendant completes a job requisition or reclassification for 2011 and this position in 2015;" and "the email chain of approval that will show who had to give their approval to offer Mr. Lay his positions in 2011 and 2015 as it will show the management approval needed to complete a job requisition or reclassification for Mr. Lay in 2011 and his current position in 2015." (Docket Entry Nos. 119-121, at ¶¶ 6-8). Plaintiffs also assert that "Defendant did not contest the releasing of Mr. Dwight Lay's employee file since he was the focus of the Plaintiffs cause of action." *Id.* at ¶ 5.

However, Defendant did object to Plaintiffs' request for the entirety of Lay's personnel file, but agreed, subject to a protective order, to produce Lay's resume, his 2014 performance evaluation

17

and records relating to his application and progression to the team lead position in 2015. (Docket Entry No. 79-2, at ¶¶ 15, 20). The parties filed a joint statement with the Court setting forth their respective positions as to which discovery issues remained in dispute (Docket Entry No. 81) and subsequently participated in a lengthy in-court hearing on October 31, 2018, before the Magistrate Judge to discuss them (Docket Entry No. 84). Plaintiffs did not raise any dispute as to Defendant's objections to producing documents from Lay's personnel file beyond the documents identified in its discovery responses. Nor did Plaintiffs raise prior to their summary judgment response any discovery dispute over the scope of documents produced relating to Lay. Plaintiffs have failed to articulate any justification for their untimeliness. Moreover, Plaintiffs fail to articulate the relevance of any such documents from 2011 to their claim involving Lay's promotion to the User Security team lead position in 2015. Accordingly, Plaintiffs' argument is without merit.

## B. FAILURE TO PROMOTE

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual on the basis of race. 42 U.S.C. § 2000e-2(a). Similarly, § 42 U.S.C. § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). A plaintiff may establish a case of unlawful discrimination through either direct or circumstantial evidence.[6] *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814

_____

[6]"Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions,'" whereas circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (citation omitted).

18

F.3d 769, 775 (6th Cir. 2016). Absent direct evidence, like here, to establish a prima facie case of race discrimination based on a "failure to promote" theory, a plaintiff must establish that: (1) he or she is a member of a protected class; (2) he or she applied and was qualified for a promotion; (3) he or she was considered for and denied the promotion; and (4) another employee of similar qualifications who was not a member of the protected class received the promotion at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000); *Philbrick v. Holder*, 583 F. App'x 478, 482 (6th Cir. 2014); *Hicks v. SSP Am., Inc.*, 490 F. App'x 781, 783-84 (6th Cir. 2012).[7] As to the fourth prong, "it is insufficient for a plaintiff in a failure to promote . . . discrimination case merely to point to a [non-protected person] who received the job in satisfying the fourth prong." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 241 (6th Cir. 2005). "'[T]o satisfy the fourth prong . . . it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications.'" *Hicks*, 490 F. App'x at 784 (quoting *White*, 429 F.3d at 242).

After proving the existence of a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Nguyen*, 229 F.3d at 562. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000)). "If the defendant meets this burden,

---

[7]Courts "review claims of alleged race discrimination brought under § 1981 . . . under the same standards as claims of race discrimination brought under Title VII." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018).

19

the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination." *Nguyen*, 229 F.3d at 562.

The plaintiff may establish pretext by showing that the defendant's stated reason for the employment action (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the challenged action. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). Regardless of which rebuttal method is used, the plaintiff has the ultimate burden of producing sufficient evidence so that a trier of fact could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). "'The jury may not reject an employer's explanation . . . unless there is a sufficient basis in the evidence for doing so.'" *Upshaw*, 576 F.3d at 586 (citation and emphasis omitted). Thus, "[i]f the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Id.* "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)).

### 1. Jefferson

Defendant contends that Jefferson cannot establish the fourth element of his prima facie case because Jefferson cannot show that he and Lay were similarly qualified and he cannot show that Defendant's reasons for selecting Lay for the team lead position were pretextual. (Docket Entry No.

20

97, at 10). In response, Jefferson contends that "Lay's tenure was granted through favored treatment" not offered to Jefferson, as Lay was offered a position for which he did not apply, and that Lay "has never been required to obtain industry certification nor has he obtained higher education in the Information technology field and has been favored in his career growth which includes not properly meeting the User Security educational standards that help his line of promotions." (Docket Entry No. 118, at 2).[8]

Based upon the undisputed facts and the admissible evidence in the record, Jefferson fails to establish the fourth prong of his prima facie case that he and Lay were similarly qualified. A court must "conduct an independent review of the relative qualifications of the plaintiff and the person selected for the position based on the evidence presented in order to determine whether the plaintiff has satisfied the fourth prong of h[is] prima facie burden." *White*, 429 F.3d at 243. At the time of the creation of the User Security team lead position in September 2015, Lay had worked for Defendant for nearly four years on the User Security team and, prior to that, had worked approximately three years for Defendant on a temporary assignment through a staffing agency before being hired by Defendant, for a total of seven years with Defendant. Jefferson, on the other hand, worked for Defendant for about two years and four months on the User Security team, and, prior to that, worked about two years and three months for Defendant as a contractor before being hired by Defendant, for a total of four years and seven months with Defendant. In their 2014 performance evaluations, Lay received an overall 1+ rating and "proficient" status, whereas

---

[8]Each Plaintiff makes these same assertions. Thus, the Magistrate Judge's conclusions apply equally to Waire's and Webster's arguments as those Plaintiffs do not present any distinguishing facts in support of their arguments.

21

Jefferson received a 2+ rating and overall "developing" status.[9] The management team also received unsolicited positive feedback from clients about Lay, managers observed that Lay's peers were already treating Lay as a team lead by reaching out to him for Tier II technical guidance, and without being asked, Lay had taken on some aspects of a team lead role when assistance was needed. Accordingly, the Magistrate Judge concludes that Jefferson and Lay cannot be considered similarly qualified for the position, as required to meet the fourth prong of Jefferson's prima facie burden.

Further, even if Jefferson were able to satisfy his prima facie burden, his claim still fails because Defendant has produced a legitimate non-discriminatory reason for selecting Lay for the User Security team lead. Lay had a longer tenure working for Defendant on the User Security team, as well as total years with Defendant than Jefferson. Lay also received a higher performance rating than Jefferson. Lay also stood out because of the unsolicited positive feedback Defendant received from customers about Lay's job performance and because Lay had already taken on some of the aspects of a team lead role. Thus, Defendant has met its burden. *See Williams v. Columbus Metro. Hous. Auth.*, 90 F. App'x 870, 873 (6th Cir. 2004) ("Hiring a more qualified candidate certainly suffices as a legitimate, nondiscriminatory rationale for denying [a plaintiff] [a] promotion."); *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 616 (6th Cir. 2003) (defendant's decision to offer position to candidate who had higher total score on interview than plaintiff was a legitimate, non-discriminatory reason).

---

[9]Defendant also compares Jefferson's and Lay's military backgrounds and cites Jefferson's termination from a prior job. However, there is nothing in the record that shows that this part of Jefferson's background was in his employment file or known by Defendant at the time of the job posting.

22

However, Jefferson fails to show that Defendant's proffered reasons were pretextual. "'Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination.'" *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (citations and internal quotation marks omitted); *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 469-70 (6th Cir. 2014). The evidence in the record fails to show that Jefferson was "a plainly superior candidate" or that he was "as qualified as if not better qualified" as Lay for the User Security team lead position.

Jefferson asserts that he has "a lifetime certification with CompTIA as a CompTIA A+ and a CompTIA Network+ technician," obtained his ITIL certification in 2017 that was paid for by Defendant, and that Lay expressed no interest to further his technical aptitude past being trained on the job. (Docket Entry No. 118, at 3, 2). However, Jefferson received these certifications in 2005, has not obtained any certifications in any more recent Microsoft Office suites and has not participated in CompTIA's continuing education program to remain current. (Docket Entry No. 122, at ¶ 38; Docket Entry No. 124-6, at 1). Also, Jefferson's 2017 certification is immaterial as he obtained it in 2017, long after Lay was promoted to the User Security team lead position. Further, Jefferson's personal opinion that training and experience obtained on-the-job should not be valued for some reason is insufficient to establish pretext. Jefferson's subjective belief that he was better qualified and should have been selected for the team lead position instead of Lay cannot alone establish pretext. A plaintiff's "subjective view of [his] qualifications in relation to those of the

23

other applicants, without more, cannot sustain a claim of discrimination." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004). Moreover, "[i]n reviewing employer decisions regarding qualifications, '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.'" *Wheeler v. Miami Valley Career Tech. Ctr.*, No. 16-3153, 2017 WL 9473121, at *3 (6th Cir. Jan. 9, 2017) (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006) (citation and internal quotation marks omitted)). A court may not act "as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Bender*, 455 F.3d at 627 (citation omitted). As the Sixth Circuit has "oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management.'" *Hedrick*, 355 F.3d at 462 (citation omitted).

Even if Jefferson could show that he was as qualified as Lay for the User Security team lead role in September 2015, Jefferson would still need to present additional evidence that Defendant's decision was based on race. "'Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination.'" *Risch*, 581 F.3d at 392 (quoting *Bender*, 455 F.3d at 626). Jefferson cites that Lay was offered a position for which he did not apply. Yet, the undisputed facts show that Dixon consulted with Schambeck to determine which individuals on the User Security team, of which Jefferson was a member, would be the best fit for the team lead role. (Docket Entry No. 122, at ¶ 9).

Jefferson argues that the team lead position was not posted for less than five days as provided by the policy. However, the policy specifically provides that "Job transactions/vacancies *may not be posted* as a result of: "Re-title, reclassification, or re-grade of positions occupied by incumbents, and Transfer or reorganization of responsibilities within or between departments. Positions through

24

succession planning." (Docket Entry No. 105-2, at 1). Here, the team lead role resulted from a retitle, reclassification or re-grade of a position held by an incumbent and arose out of a transfer or reorganization of responsibilities within the department. Lay's reclassification to team lead also did not result in additional personnel to the User Security team. Further, even if the team lead role should have been posted for a longer period of time under Defendant's internal policy, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White*, 429 F.3d at 246. Jefferson does not present any evidence connecting any alleged failure to "properly post" the position to his race. As to any claim that Defendant inconsistently used educational requirements as a means to discriminate, the job posting for the team lead position stated that a "Bachelor's Degree in Computer Science *or equivalent experience*" was required. (Docket Entry No. 122, at ¶ 5). Jefferson admits that he was never told that he was not selected for the team lead job based on his lack of a college degree or because he did not meet an educational requirement.

Finally, as to Jefferson's allegations that Whitehead gave Lay "special treatment" or had "plans" for Lay and "Whitehead was permitted to bypass department requirements to move Mr. Lay into User Security Department," (Docket Entry No. 118, at 2, 3, 13), Jefferson fails to produce any admissible evidence in support. Whitehead testified that he learned of Lay's reclassification after the decision had been made, when Schambeck told him, "we're making a new team lead position. That's going to go to Dwight [Lay]." (Docket Entry No. 103-9, at 4-5).

Accordingly, for all of these reasons, the Magistrate Judge concludes that Jefferson's failure to promote claim is without merit.

### 2. Waire

25

Defendant contends that Waire cannot establish the second, third and fourth prongs of his prima facie case; that is, Waire cannot show that he applied for and was qualified for a promotion, that he was considered for and was denied the promotion, or that he and Lay were similarly qualified. (Docket Entry No. 99, at 11). As to the second and third prongs, the record shows that the team lead role for the User Security team was posted for about twenty-four hours, and although several external applicants applied, Waire did not. Further, Waire worked on the Applications team throughout his employment with Defendant and never worked on the User Security team, the group where Defendant looked for the best candidate for the team lead role. Thus, based upon the undisputed facts, Waire cannot establish the second and third prongs.[10]

---

[10] In *Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000), the plaintiff alleged that his former employer failed to promote him to regional sales manager based on his race. *Id.* at 1019. In granting the defendant's motion for summary judgment, the district court concluded that Dews failed to establish that he applied for the manager positions and that the defendant did not consider him for those positions. *Id.* at 1021. Relying on *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir.1984), the Sixth Circuit held:

> [I]n failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known.

*Id.* at 1022. *Dews* is inapplicable here as the position was posted, albeit for 24 hours, and external applicants did apply for the User Security team lead position. Also, Defendant's policy provided that "Job transactions/vacancies *may not be posted* as a result of: "Re-title, reclassification, or re-grade of positions occupied by incumbents, and Transfer or reorganization of responsibilities within or between departments. Positions through succession planning." (Docket Entry No. 105-2, at 1). Thus, as a reclassification, the position was not required to be posted, and Defendant considered incumbent members of the User Security team. In any event, Waire fails to show that he and Lay were similarly qualified. As discussed *infra*, this analysis applies to Webster as well.

26

Further, Waire cannot show that he and Lay were similarly qualified. Lay began working through a staffing agency at Defendant in 2008 and had worked for Defendant on the User Security team since October 2011. As discussed previously, in his 2014 performance evaluation Lay received an overall 1+ rating and "proficient" status, had proactively taken on aspects of the team lead role in his manager's absence, and was the subject of unsolicited positive customer feedback. Waire, on the other hand, obtained his first IT-related job in 2011; began working for Defendant in or around October 2012; worked as a help desk analyst on the Applications team; never worked on the User Security team; described his role on the Applications team as being "a glorified ticket handler" who "could not even reset a password at that point;" and on his 2015 review, received a "3" rating in every category except one. Thus, Waire fails to show that he and Lay had similar qualifications.

Moreover, even if Waire could establish his prima facie case, as with Jefferson and for those same reasons previously discussed, Defendant has established a legitimate non-discriminatory reason for selecting Lay for the User Security team lead. Likewise, Waire is unable to show pretext for the same reasons previously discussed, as Waire asserts the same general arguments as Jefferson and does not cite any different evidence in support.

Accordingly, for all of these reasons, the Magistrate Judge concludes that Waire's failure to promote claim is without merit.

### 3. Webster

Defendant contends that Webster was not employed by Defendant, but by the staffing agency, Beacon Hill, and therefore was not eligible to be "promoted." Defendant also contends that Webster cannot establish the second, third and fourth prongs of her prima facie case. (Docket Entry

No. 101, at 9-10). The record reflects that Defendant posted the job externally and received external applications. Thus, Webster's claim could be construed as a failure to hire claim as there is no material difference between the prima facie standards on these facts. *See Perkins v. Harvey*, 368 F. App'x 640, 644 n. 3 (6th Cir. 2010).

As to the second and third prongs, the record shows that the team lead role for the User Security team was posted for about twenty-four hours, and although several external applicants applied, Webster did not. Further, Webster worked as a call handler on the Generalist team and never worked on the User Security team, the group from whom Defendant looked for the best candidate for the team lead role. The undisputed facts show that when Webster began working for Defendant in 2011 she had "very little" IT experience, she had no prior work experience assisting users of computer systems with their technology issues and had only limited technical support capabilities, she was unable to resolve intermediate to highly difficult IT problems, and she was never asked to provide second tier support for the User Security Administrators on that team. Webster fails to provide any admissible evidence that she was qualified for the User Security team lead position. Thus, based upon the undisputed facts, Webster cannot establish the second and third prongs of her prima facie case.

Further still, Webster cannot show that she and Lay had similar qualifications. Lay began working through a staffing agency at Defendant in 2008 and had worked for Defendant on the User Security team since October 2011. In his 2014 performance evaluation Lay received an overall 1+ rating and "proficient" status, had proactively taken on aspects of the team lead role in his manager's absence, and was the subject of unsolicited positive customer feedback. Webster, on the other hand, had "very little" IT experience when she took the call handler assignment in 2011, never worked as

28

a member of the User Security team, had a shorter overall tenure with Defendant than Lay, had only limited technical support capabilities, was unable to resolve intermediate to highly difficult problems, and was never asked to provide second tier support for any user security team member or to resolve even intermediate IT problems. Thus, Webster fails to show that she and Lay had similar qualifications.

Moreover, even if Webster could establish her prima facie case, as with Jefferson and for those same reasons previously discussed, Defendant has established a legitimate non-discriminatory reason for selecting Lay for the User Security team lead. Likewise, Webster is unable to show pretext for the same reasons previously discussed, as Webster asserts the same general arguments as Jefferson. Webster also cited two reasons why she believed she was more qualified than Lay: (1) her past experience as a non-supervisory team lead for a customer relations team at an insurance company sometime during 2003-2006 and (2) what she learned as a call handler. (Docket Entry No. 103-7, at 77-79). Neither of these reasons establish that Webster was "a plainly superior candidate" or "as qualified" as Lay, as the undisputed facts reflect that Webster had "very little" IT experience when she took the call handler assignment in 2011, never worked as a member on the User Security team, had a shorter overall tenure with Defendant than Lay, had only limited technical support capabilities, was unable to resolve intermediate to highly difficult problems, and was never asked to provide second tier support for any User Security team member or to resolve even intermediate IT problems.

Accordingly, for all of these reasons, the Magistrate Judge concludes that Webster's failure to promote claim is without merit.

### C. RACIAL HARASSMENT-HOSTILE WORK ENVIRONMENT

As an initial matter, in their brief, Plaintiffs implicitly abandon their claims for racial harassment by their silence in failing to address Defendant's specific attacks leveled against Plaintiffs' claims. Plaintiffs have not attempted to file any additional briefings, such as a surreply, to respond to Defendant's contentions in its reply (Docket Entry No. 125, at 1-2) that Plaintiffs have abandoned these claims. Thus, the Magistrate Judge concludes that this claim is abandoned. *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 809 (M.D. Tenn. 2011); *Gibson-Holmes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009); *Perry v. Hoeganaes Corp.*, No. 3040525, 2005 WL 1875090, at *6 (M.D. Tenn. Aug. 5, 2005); *but see Wiseman v. Convention Ctr. Auth. of the Metro. Gov't of Nashville & Davidson Cty.*, No. 3:14 C 01911, 2016 WL 54922, at *13 (M.D. Tenn. Jan. 5, 2016) (addressing merits of claim even though plaintiff failed to defend to her claim, but noting that it "need not '*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party,'" or that it was not "required to advance legal arguments ignored by the non-movant.") (citations omitted). Regardless, it is clear that Plaintiffs' racial harassment claims also fail on the merits.

"Title VII protection extends to a plaintiff who shows that his or her workplace 'is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 626-27 (6th Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The defendant's conduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive[.]' Additionally, the plaintiff must subjectively perceive the environment to be abusive." *Austion v. City of Clarksville*, 244 F. App'x 639, 652 (6th Cir. 2007) (citations

30

omitted).  To establish a prima facie case of racial harassment based on hostile work environment, a plaintiff must establish that (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his or her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable.  *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).

To assess the fourth prong, courts "must examine the totality of the circumstances."  *Id.*  Thus, courts must examine "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* (citations omitted).  To amount to a change in the terms and conditions of employment, the conduct must be extreme.  *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  "'[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  *Id.* (citation omitted).  The third prong, however, limits the scope of the analysis in the fourth prong: "only harassment *based on the plaintiff's race* may be considered."  *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citation omitted) (emphasis in original).

Jefferson does not cite to any conduct constituting racial harassment.  When asked how he was harassed based on his race, Jefferson testified "I would say that the act of dealing with this process is a harassment for me," which he explained as being the "promotion issue."  (Docket Entry No. 103-1, at 53-54).  This lone allegation of race-related harassment does not meet Jefferson's

burden of showing he was subjected to an environment so severe or pervasive as to alter the conditions of his employment. Accordingly, Jefferson's claim is without merit.

As to Waire's claim, Waire testified that he was harassed and ridiculed and was made fun of for his sexual orientation, skin tone, hair, and age. Waire testified that Whitehead disliked his personality, Waire's sexual orientation, and the fact that Waire "did not grow up struggling" and was financially "okay. Waire, however, did not attribute the alleged harassment to race. The only comments that Waire alleges that may arguably be race-related pertain to Foster's statements about his hair looking like "road kill" and that she once dated a black man. Waire testified that he believed that Foster made those comments between 2013 and 2016. Waire did not identify any race-specific comment or behavior by Whitehead, other than to say he talked about his hair. Accordingly, Waire fails to show that the alleged harassment was based on race.

Further, Waire cannot show that the alleged harassment, even if it were race-based, was severe or pervasive. The alleged comments and conduct by Whitehead and Foster fail to rise to the level of "discriminatory intimidation, ridicule, and insult." In *Lovelace v. BP Prod. N. Am., Inc.*, 252 F. App'x 33, 41 (6th Cir. 2007), the Sixth Circuit cited examples of cases where it found workplace condut to be "merely offensive," but not sufficiently severe or pervasive to be cognizable under Title VII. The Court stated:

> In sum, we conclude that the present circumstances are comparable to those cases in which we have found workplace conduct to be "merely offensive" but not sufficiently severe or pervasive to be cognizable under Title VII. *Harris*, 510 U.S. at 21, 114 S.Ct. 367. For instance, in *Kelly v. Senior Ctrs., Inc.*, 169 Fed.Appx. 423 (6th Cir.2006), we held that the plaintiff failed to allege facts sufficient to meet the *Harris* threshold where staff members used the pejorative N-word in referring to participants in a program that plaintiff supervised; an executive described a board member as a "token black," commented that the participants were slovenly or were "pigs" at meals, and tolerated others' racist behavior; another coworker made three racist jokes; and rude comments were made about African-American staff members'

32

bathroom habits. We noted that "[w]hile these incidents are deplorable and offensive, they do not amount to a pervasive, aggressive, or constant course of conduct." *Kelly*, 169 Fed.Appx. at 429. *See also Bowman*, 220 F.3d at 464 (holding that five incidents of racial harassment did not constitute severe or pervasive conduct); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760–61 (6th Cir.2000) (incidents including one racial slur directed at plaintiff, racially offensive and obscene cartoon circulated in workplace, and African-American employee referred to as a "gorilla" were deemed not severe or pervasive enough to constitute objectively hostile work environment); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997) (holding that plaintiffs failed to show existence of an objectively hostile work environment where most of the alleged discriminatory remarks were not directed at the plaintiff and "[a]lthough the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was 'not designed to purge the workplace of vulgarity.'") (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)).

*Id.*

Accordingly, based upon these authorities, the Magistrate Judge concludes that Waire's claim is meritless.

As to Webster's claim, Webster failed to identify any race-specific comments Whitehead made, and only testified that Whitehead commented about her body type, that he gave her some jeans, and that he said that she looked good in them. When asked how Whitehead's comments and conduct related to her race, Webster testified that she felt Whitehead looked at her in a "relationship type status." With regard to Foster, Webster stated that she felt pressured into being Foster's secretary, that Foster picked on her, and Foster likened Webster's hair to that of Rachel Dolezal. The Magistrate Judge concludes that Webster fails to show that this alleged harassment was based on race. Further, like Waire, Webster cannot show that the alleged harassment, even if it were race-based, was severe or pervasive. The alleged comments and conduct by Whitehead and Foster fail to rise to the level of "discriminatory intimidation, ridicule, and insult."

## D. RETALIATION

33

Like, their harassment claims, Waire and Webster did not address Defendant's contentions regarding their retaliation claims and, thus, have implicitly abandon their retaliation claims. *Burress*, 809 F. Supp. 2d at 809; *Gibson-Holmes*, 661 F. Supp. 2d at 912; *Perry*, 2005 WL 1875090, at *6. Regardless, it is clear that Plaintiffs' retaliation claims also fail on the merits.

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he or she engaged in activity protected by Title VII; (2) the defendant knew of his or her exercise of his or her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Barrett*, 556 F.3d at 516. "To establish the third element of the *prima facie* Title VII retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Burlington Northern & Santa Fey Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). As to the fourth element, "[i]n determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett*, 556 F.3d at 516-17. "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

The undisputed facts show that Waire was laid off in July 2017, in connection with organizational changes affecting the IT department. In or about October 2016, the entire Generalist department in Nashville was outsourced and its team members were laid off. In late summer of 2017, fifteen months after he filed his EEOC charge, Waire and at least two other Application team members working in the Nashville office were laid off when their jobs were required to be centrally located with the manager of the department in Waltham, Massachusetts. Another IT department, the eCube Support team, was also dissolved as part of the restructuring. Waire fails to present proof that there was a causal connection between his protected activity and the adverse employment action.

As to Webster, first, she was an employee of Beacon Hill, not of Defendant. Second, Webster admitted that her assignment with Defendant ended because the *entire department* was outsourced, which was six months after she filed her EEOC charge. (Docket Entry No. 122, at ¶ 119). Third, when the call handler assignment ended, Webster received another assignment with Defendant with better pay. Webster also testified that she never received any formal discipline during her assignment with Defendant and received raises from Beacon Hill. As to her complaint about being critiqued, Webster testified that she was required to "continue" training others, which was already a part of her job duties as a call handler. Accordingly, based upon the undisputed facts, the Magistrate Judge concludes that Webster fails to establish a prima facie claim of retaliation.

## V. RECOMMENDATION

Accordingly, for these reasons, the Magistrate Judge **RECOMMENDS** that Defendant's motions for summary judgment (Docket Entry Nos. 96, 98 and 100) be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE.**

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation ("R&R") to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 30th day of August, 2019.

/s/    Joe B. Brown
JOE B. BROWN
United States Magistrate Judge